UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ST. PAUL FIRE AND MARINE INSURANCE COMPANY, a Minnesota corporation; and ST. PAUL MERCURY INSURANCE COMPANY, a Minnesota corporation,<br><br>    Plaintiffs,<br><br>  v.<br><br>ACE AMERICAN INSURANCE, a Pennsylvania corporation, et al.,<br><br>    Defendants. | No. CIV. S-12-3041 LKK/GGH<br><br>**ORDER** |

Plaintiffs St. Paul Fire and Marine Insurance Company (St. Paul) and Travelers Property Casualty Company of America (Travelers) sue, inter alia, defendant Arch Specialty Insurance Company (Arch) in this diversity action for declaratory judgment and equitable contribution, claiming Arch breached its contractual duty to defend and/or indemnify Beazer Homes (Beazer) in an action brought by homeowners for construction defects.[1]

---

[1] Plaintiffs have sued a number of other defendants in this action. Many have been dismissed by stipulation. The motions at bar involve only plaintiffs' claims against Arch.

1

Plaintiffs filed this action on December 18, 2012.  The action is now proceeding on the first amended complaint, filed November 27, 2013 (ECF No. 197).  It is before the court on cross-motions for partial summary judgment.  By these motions, the parties seek resolution of whether Arch had a duty to defend Beazer in the underlying homeowners' action.

**I.  FACTS**

    **A.  Stipulated Facts**

Plaintiffs St. Paul and Travelers and defendant Arch stipulate to the following facts for purposes of the instant cross-motions.

On April 29, 2010, the owners of 152 single family homes at housing developments in Yuba City, California filed an action in Yuba County Superior Court against Beazer.[2]  On March 4, 2011, 273 owners of single family homes filed a second amended complaint in the superior court action.  The homeowners alleged defects and damages in their homes.

Beazer was the developer and general contractor for six residential developments.  Beazer entered into subcontracts with Borge Construction, Inc. dba Color Core and/or Color Core, Inc.; Tileco; Larry Methvin Installations; Michael Hopper Construction, Inc.; and Marble Palace, Inc. for various work at some or all of the six residential developments.

All of the homes at issue in the underlying action were completed sometime between February 20, 2004 and August 25, 2005.

---

[2] Plaintiffs request that the court take judicial notice of the original and second amended complaints filed in the state court action, as well as a cross-complaint filed therein.  Pls. Req. for Judicial Notice (ECF No. 229-3).  Good cause appearing, pursuant to Fed. R. Evid. 201 the request is granted.

2

1  The homes in one of the residential developments, the
2  Independence Trail development, were completed between February
3  20, 2004 and December 29, 2004.
4      Defendant Arch issued commercial general liability policies
5  to Borge Construction, Inc. (Borge); Tileco; Larry Methvin
6  Installations (Methvin); and Michael Hopper Construction (Hopper)
7  (three policies in three consecutive years).  Travelers issued a
8  policy to Marble Palace, Inc.
9      On July 26, 2010, Beazer tendered its defense of the
10 underlying action to Arch under the policies issued by Arch.
11 Arch denied any duty to defend Beazer on various grounds,
12 including limitations of the additional insured endorsements
13 contained in the policies, which limit coverage to an otherwise
14 qualifying additional insured to liability arising out of the
15 named insured's "ongoing operations."
16     On June 24, 2011, Beazer tendered its defense of the
17 underlying action to Travelers.  On October 19, 2011, Travelers
18 issued a letter denying the duty to defend Beazer.
19     **B.  Additional Facts**
20     With one exception discussed below the following facts,
21 though not contained in the parties' stipulation, are undisputed.
22 Borge subcontracted to perform interior and exterior painting in
23 at least three of the subdivisions.  Exs. E, F, and G to LaSalle
24 Decl.  Tileco subcontracted to install kitchen countertops,
25 sinks, and backsplashes in the Independence Trail subdivision.
26 Ex. J to LaSalle Decl.  Methvin subcontracted to perform the
27 mirror, tub, and shower enclosure work at the Independence Trail
28 subdivision.  Ex. L to LaSalle Decl.  Hopper subcontracted to

perform millwork, interior trim, cabinetry trim, installation of finish hardware and weather stripping, fit and hang doors, and install cabinets at the Bridgeport Crossing, Sweetwater Ranch II, Bridgeport II, and Orchard Glen subdivisions.  Exs. P, R, S and T to LaSalle Decl.[3]

Each of the four subcontractors was, pursuant to contract, required to obtain insurance coverage, including general liability coverage with Beazer as an additional insured.  See Exs. E, F, G, J, L, P, Q, R, S, and T to Decl. of Scott LaSalle (ECF No. 229-4).  With respect to this coverage, the contracts provide:  "Additional Insured:  Beazer Homes USA, Beazer Homes Holdings Corp., Homes Southern Northern California, it's affiliated and subsidiary companies, officers, directors, agents and employees to be named as Additional Insured with respect to work done by, or on behalf of, Subcontractor.  Beazer Homes accepts endorsements with wording equivalent to 'completed and ongoing operations. . .' or 'arising out of your work. . .'"  See, e.g., Ex. E to LaSalle Decl. (ECF[4] No. 229-4) at 62.

Arch issued commercial general liability policies to, respectively, Borge, Genesis, Methvin, and Hopper. Exs. D, I, K and O to LaSalle Decl. (ECF No. 229-4).  Each of the policies specifies in relevant part that the insurance provided thereby

---

[3] Arch disputes that Hopper actually installed the cabinets or doors and have tendered the Declaration of Gregory J. Newman and attached exhibits as evidence that Beazer entered into contracts with different subcontractors for this work.  Plaintiffs object to these statements and the accompanying evidence.  For purposes of this motion, the dispute is irrelevant because, as will be discussed, the allegations of the underlying complaint are sufficient to establish a duty to defend Beazer as to the millwork and trim work along.  The dispute may, however, become relevant at a subsequent stage of these proceedings.

[4] References to page numbers are to the ECF page number at the top of the identified document.

4

"applies to 'bodily injury' or 'property damage' only if: (1) The 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory'; and (2) The 'bodily injury' or 'property damage' occurs during the policy period." See, e.g., Ex. D to LaSalle Decl. (ECF No. 229-4) at 9. "Occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." See, e.g., id. at 24.

Each of the policies was amended to include as an additional insured any entity "where required by written contract" "but only with respect to liability arising out of [Borge, Genesis, Methvin or Hopper]'s ongoing operations." See, e.g., id. at 29. "Ongoing operations" is not defined in the policies. Each of the policies also contain exclusions that exclude from coverage in relevant part:

> j. Damage to Property
>
> "Property Damage" to:
>
> (5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or
>
> (6) That particular part of any property that must be restored, repaired, or replaced because "your work" was incorrectly performed on it.
>
> . . . .
>
> Paragraph (6) of this exclusion does not apply to "property damage" included in the products-completed operations hazard.

5

0

1  See, e.g., id. at 12.

2      "Products-completed operations hazard" means:

3      a. All "bodily injury" and "property damage"
4      occurring away from premises you own or rent
    and arising out of "your product" or "your
5      work" except:

6          (1) Products that are still in your
        physical possession; or
7

8          (2) Work that has not yet been
        completed or abandoned.  However, "your
9          work" will be deemed completed at the
        earliest of the following times:
10

11          (a) When all of the work called
        for in your contract has been
12          completed.

13          (b) When all of the work to be
        done at the job site has been
14          completed if your contract calls
        for work at more than one job
15          site.

16          (c) When that part of the work
        done at a job site has been put to
17          its intended use by any person or
        organization other than another
18          contractor or subcontractor
        working on the same project.
19

20      Work that may need service,
    maintenance, correction, repair or
21      replacement, but which is otherwise
    complete, will be treated as completed.
22

23  See, e.g., id. at 25.

24     In the underlying action, the plaintiff homeowners allege a

25  variety of construction defects including

26      [f]aulty soil compaction, faulty existing
    underlying soils and expansive soils
27      resulting in soil movement and damage to the
    structures, concrete slabs, flatwork and
28

6

>foundation defects; plumbing defects; electrical defects; drainage defects; roof defects; HVAC defects; waterproofing defects; window and door defects; landscaping and irrigation defects; framing, siding and structural defects; ceramic tile, vinyl flooring and *countertop defects*; drywall defects; fence and retaining wall defects; cabinets and *wood trim defects*; fireplace and chimney defects; *tub and shower door defects*; *painting defects*; sheet metal defects; and stucco defects.

Exs A and C to Pls. Req. for Judicial Notice (ECF No. 229-3) at 16-17, 79-80 (emphasis added). Plaintiff homeowners also allege these defects "have resulted in damage to the homes and their component parts." Id. In addition, plaintiff homeowners also allege that the property was not constructed "in a workmanlike manner as manifested by, but not limited to, numerous defects which have resulted in damage to the homes and their component parts." Exs A and C to Pls. Req. for Judicial Notice (ECF No. 229-3) at 22, 85. Included are allegations that "Shower and bath enclosures at the PROPERTY leak water into the interior of walls, flooring systems, or other components;" "Ceramic tile and tile countertops at the PROPERTY allow water into the interior of walls, flooring systems, or other components[5];" and "Paint and stains at the PROPERTY have been applied in such a manner so as to cause deterioration of the building surfaces;" Id. at 24, 87.

---

[5] Tileco's contract states that they used Corian and granite countertops, counter edges, backsplashes, and sink undermounts. It is unclear whether this constitutes "ceramic tile and tile countertops."

7

Plaintiff homeowners allege that "the defects and damages were latent" and were "not apparent by reasonable inspection of the property at the time of the purchase." Id. at 28-30, 93.

## II. STANDARDS FOR SUMMARY JUDGMENT

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (it is the movant's burden "to demonstrate that there is 'no genuine issue as to any material fact' and that the movant is 'entitled to judgment as a matter of law'"); Walls v. Cent. Contra Costa Transit Auth., 653 F.3d 963, 966 (9th Cir. 2011) (per curiam) (same).

Consequently, "[s]ummary judgment must be denied" if the court "determines that a 'genuine dispute as to [a] material fact' precludes immediate entry of judgment as a matter of law." Ortiz v. Jordan, 562 U.S. ___, 131 S. Ct. 884, 891 (2011) (quoting Fed. R. Civ. P. 56(a)); Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011) (en banc) (same), cert. denied, 132 S. Ct. 1566 (2012).

Under summary judgment practice, the moving party bears the initial responsibility of informing the district court of the basis for its motion, and "citing to particular parts of the materials in the record," Fed. R. Civ. P. 56(c)(1)(A), that show "that a fact cannot be . . . disputed." Fed. R. Civ. P. 56(c)(1); Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Securities Litigation), 627 F.3d 376, 387 (9th Cir. 2010) ("The moving party initially bears the burden of

8

proving the absence of a genuine issue of material fact") (citing Celotex v. Catrett, 477 U.S. 317, 323 (1986)).

A wrinkle arises when the non-moving party will bear the burden of proof at trial. In that case, "the moving party need only prove that there is an absence of evidence to support the non-moving party's case." Oracle Corp., 627 F.3d at 387.

If the moving party meets its initial responsibility, the burden then shifts to the non-moving party to establish the existence of a genuine issue of material fact. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86 (1986); Oracle Corp., 627 F.3d at 387 (where the moving party meets its burden, "the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial"). In doing so, the non-moving party may not rely upon the denials of its pleadings, but must tender evidence of specific facts in the form of affidavits and/or other admissible materials in support of its contention that the dispute exists. Fed. R. Civ. P. 56(c)(1)(A).

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. See T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all reasonable inferences supported by the evidence in favor of the non-moving party." Walls, 653 F.3d at 966. Because the court only considers inferences "supported by the evidence," it is the non-moving party's obligation to produce a factual predicate as a basis for

such inferences. See Richards v. Nielsen Freight Lines, 810 F.2d 898, 902 (9th Cir. 1987). The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 586-87 (citations omitted).

**III.  ANALYSIS**

At issue on the present motion is whether Arch had a duty to defend Beazer in the underlying action brought by the homeowners. At oral argument, the parties agreed that disposition of the motion turns on interpretation of the insurance policies issued by Arch to resolve whether there is any possibility those policies might cover losses claimed in the underlying litigation. California law governs resolution of this question.

A.  Burden of Proof

The "settled rule" in California "is that where a pleading against the insured raises the potential for coverage, the insurer must provide a defense. ( Montrose Chem. Corp. v. Superior Court (1993) 6 Cal.4th 287, 295, 24 Cal.Rptr.2d 467, 861 P.2d 1153 [ Montrose ].)" Atlantic Mutual Ins. Co. v. J. Lamb, Inc., 100 Cal.App.4th 1017, 1032 (Cal.App. 2 Dist. 2002). "In order to prevail on a motion for summary adjudication of the duty to defend, 'the insured need only show that the underlying claim *may* fall within coverage; the insurer must prove it *cannot*.'" Id. (quoting Montrose at 300)(emphasis in original). "Doubts concerning the potential for coverage and the existence of a duty to defend are resolved in favor of the insured." Regional Steel

1  Corporation v. Liberty Surplus, 226 Cal.App.4th 1377 (Cal.App. 2
2  Dist., 2014) (citing Montrose, at 299-300).
3        B.   Standards for Duty to Defend
4        As a general rule, determination of whether the insurer owes
5  a duty to defend is "made by comparing the allegations of the
6  complaint with the terms of the Policy. The insurer's defense
7  duty is obviated where the facts are undisputed and conclusively
8  eliminate the potential the policy provides coverage for the
9  third party's claim." Regional Steel, 226 Cal.App.4th at 1389
10 (internal citation omitted).  The court interprets the insurance
11 policy by following the general rules of contract interpretation.
12 Id.

> The principal rule of contract interpretation is to give effect to the parties' intent as expressed in the terms of the contract. (Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co. (1993) 5 Cal.4th 854, 867.) Insurance policy terms will be given the objectively reasonable meaning a lay person would ascribe to them. (AIU Ins. Co. v. Superior Court (1990) 51 Cal.3d 807, 822.) In addition, the context in which a term appears is critical. ' "[L]anguage in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case....' " (Bay Cities Paving, supra, 5 Cal.4th at p. 867, italics omitted.) "While 'reliance on [the] common understanding of language is bedrock[,] ... [e]qually important are the requirements of reasonableness and context.' " (Ibid.)
>
> An insurance policy provision is considered to be ambiguous when it is capable of at least two reasonable constructions. If we cannot eliminate an ambiguity " 'by the language and context of the policy, [we] invoke the principle that ambiguities are generally construed against the party who

11

caused the uncertainty to exist (i.e., the insurer) in order to protect the insured's reasonable expectation of coverage.' " (County of San Diego, supra, 37 Cal.4th at p. 415.)

To that end, an insurance policy's coverage provisions must be interpreted broadly to afford the insured the greatest possible protection, while a policy's exclusions must be interpreted narrowly against the insurer. (MacKinnon, supra, 31 Cal.4th at p. 648.) The exclusionary clause must be " ' conspicuous, plain and clear.' " (State Farm Mut. Auto. Ins. Co. v. Jacober (1973) 10 Cal.3d 193, 202.) "This rule applies with particular force when the coverage portion of the insurance policy would lead an insured to reasonably expect coverage for the claim purportedly excluded." (MacKinnon, supra, 31 Cal.4th at p. 648.) While the insured has the burden of establishing the claim comes within the scope of coverage, and the insurer has the burden of establishing the claim comes within an exclusion. (Ibid.) To prevail, the insurer must establish its interpretation of the policy is the only reasonable one. (Id. at p. 655.) Even if the insurer's interpretation is reasonable, the court must interpret the policy in the insured's favor if any other reasonable interpretation would permit coverage for the claim. (Ibid.)

Id. at 1389-90.

"[I]nsurers often limit coverage in exclusions despite broad general coverage provisions." (Westoil Terminals Co., Inc. v. Industrial Indemnity Co. (2003) 110 Cal.App.4th 139, 149.) The insurer "has the right to limit the coverage of a policy issued by it and when it has done so, the plain language of the limitation must be respected." (Continental Cas. Co. v. Phoenix Constr. Co. (1956) 46 Cal.2d 423, 432.) The insured has the burden of proving his or her claim is within the basic scope of coverage, while the insurer has the burden of proving exclusions to coverage. (Golden Eagle Ins.

12

> Corp. v. Cen-Fed., Ltd. (2007) 148 Cal.App.4th 976, 984.) Provisions that limit coverage reasonably expected by an insured must be " 'conspicuous, plain, and clear.' " (Haynes v. Farmers Ins. Exchange (2004) 32 Cal.4th 1198, 1204.) Although we normally interpret insuring clauses broadly and strictly construe exclusions, " 'where an exclusion is clear and unambiguous, it is given its literal effect.' " (Westoil Terminals Co., at p. 146.)

Id. at 1394.

While the inquiry about whether there is a duty to defend begins with the allegations of the complaint, "[f]acts extrinsic to the complaint also give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy." Montrose, 6 Cal.4th at 295.

   C.  Occurrence, Ongoing Operations, and Completed Operations

The dispute at bar turns on interpretation of the additional insured coverage in Arch's insurance policies, in particular, the coverage for "property damage" caused by an "occurrence" but "only with respect to liability arising out of [the subcontractors'] ongoing operations."  It is undisputed that, as to Beazer, the insurance policies at issue do not cover property damage arising out of the subcontractors' "completed operations." The precise question before the court is whether coverage under these policies for property damage "arising out of . . . ongoing operations" includes property damage that occurred during the "ongoing operations" of the subcontractors but was not was not discovered until after those "ongoing operations" had concluded.

13

1    As discussed above, "occurrence" is defined in the Arch
2 insurance policies as "an accident, including continuous or
3 repeated exposure to substantially the same harmful conditions."
4 Under California law, "'the time of occurrence of an accident
5 within the meaning of the insurance policy is the time the
6 complaining party was damaged, not the time the wrongful act was
7 committed.'"  Pennsylvania General Ins. Co. v. American Safety
8 Indemnity Co., 185 Cal.App.4th 1515, 1526 (2010)(quoting Hallmark
9 Ins. Co. v. Superior Court, 201 Cal.App.3d 1014, 1018 (1988)).
10 Thus, "the ordinary trigger of coverage would focus on when
11 *damage* was inflicted, not on when the *causal acts* were committed.
12 . . ."  Id.(emphasis in original).

13    Ongoing operations coverage and completed operations
14 coverage are defined temporally.  "Ongoing operations" generally
15 refers to "work in progress only".  Pardee Construction Co. v.
16 Insurance Co. of the West, 77 Cal.App.4th 1340, 1359 (2000).
17 Under the Arch policies, completed operations coverage is defined
18 in relevant part to cover property damage "arising out of" the
19 subcontractors' work "except . . . work that has not yet been
20 completed or abandoned."  See, e.g., Ex. D to LaSalle Decl. (ECF
21 No. 229-4) at 25.  As discussed above, the policies include
22 specific provisions for when work is "deemed completed."  Id.
23 "Ongoing operations" and completed operations coverages "'are
24 complementary and not overlapping.'"  Fibreboard Corp. v.
25 Hartford Accident & Indemnity, 16 Cal.App.4th 492, 500 (1993)
26 (quoting 7A Appelman, Insurance Law & Practice (1979) § 4508, pp.
27 340-341.); see also Pardee, 77 Cal.App.4th at 1359 (restriction of
28 "coverage for an additional insured to the 'ongoing operations'

of the named insured . . . effectively precludes application of the endorsement's coverage to completed operations losses.")

### D. Application

With the foregoing principles in mind, the court turns first to interpretation of the insurance policies and then to the underlying complaint.

In relevant part, the policies cover property damage that occurs during the policy period. The exclusions of paragraph j(5) and (6) preclude coverage for damage to those parts of the property within the scope of each subcontractor's work; thus the policies limit coverage to damage to property other than the part of the project the subcontractor was working on.[6] With respect to claims against Beazer, the additional insured, coverage is limited to property damage "arising from" the subcontractors' "ongoing operations." "Ongoing operations" means work in progress. Construing all of these clauses together, the court finds that, as to Beazer, the Arch policies cover property damage that happened during the policy periods, arose from the ongoing operations of the subcontractors, and was to property other than property within the scope of the subcontractors' duties.

Relying on Tri-Star Theme Builders, Inc. v. OneBeacon Ins. Co., 426 Fed.Appx. 506 (9th Cir. 2011) and McMillin Const. Services, L.P. v. Arch Specialty Ins. Co., 2012 WL 243321 (S.D. Cal. 2012), plaintiff argues that the additional insured endorsement covers only the type of activity from which Beazer's liability must arise in order to be covered, not the time at

---

[6] These are exclusions j(5) and j(6). The parties appear to agree on the import of these two provisions.

1    which the injury or damage must occur.  Arch contends that
2    coverage for liability arising from "ongoing operations" ends
3    when the subcontractors' work is complete, and that the policies
4    do not extend "completed operations" coverage to Beazer.
5         The court agrees to a certain extent with both parties.  As
6    discussed above, "ongoing operations" and "completed operations"
7    are temporal concepts, with "ongoing operations" referring to
8    work in progress and "completed operations" referring to work
9    that has been completed, as defined in the policies.  Because
10   they are temporal concepts, property damage that arises from
11   ongoing operations must occur while the operations are ongoing.
12   The two concepts do not, however, address in any way when the
13   property damage must manifest or be discovered in order for
14   coverage to arise, and nothing in the policies before the court
15   addresses that question.  Viewing the policies as a whole, the
16   court finds that, as to Beazer, they cover claims for property
17   damage, other than to the property the subcontractors were
18   working on, that arose from the subcontractors' ongoing
19   operations and occurred during those operations.
20        The court further finds that the underlying homeowners'
21   complaint includes claims which could give rise to liability
22   under the policies as construed by this order.  As discussed
23   above, the allegations include allegations of damage to property
24   other than property within the scope of the subcontractors' work
25   which arose from the subcontractors' work.  The homeowners' have
26   alleged that the defects were latent and not "reasonably
27   apparent" on inspection at the time the homes were purchased.
28   These allegations are sufficient to give rise to a possibility of

coverage extended to Beazer under the additional insured endorsement in the policies.

In order to defeat St. Paul's motion for summary judgment and prevail on its cross-motion, Arch has the burden of proving that the property damage at issue in the underlying claims could not fall within the coverage afforded Beazer under the policies. See Atlantic Mutual Ins. Co. v. J. Lamb, Inc., 100 Cal.App.4th 1017, 1032 (Cal.App. 2 Dist. 2002). They have not met their burden.

Accordingly, for the foregoing reasons, IT IS HEREBY ORDERED that:

1. The April 4, 2014 motion for partial summary judgment by St. Paul Fire & Marine Insurance Company and Travelers Property Casualty Company of America is granted;

2. The April 25, 2014 cross-motion for partial summary judgment by Arch Specialty Insurance Company is denied; and

3. Arch Specialty Insurance Company owed a duty to defend Beazer Homes Holding Corp. in the underlying proceeding entitled Burghardt, et al. v. Beazer, et al., Yuba County Superior Court case No. 10-0000378.

DATED: August 13, 2014.

LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT

17